**In re PACIFIC GAS & ELECTRIC COMPANY, Debtor.**

**No. 01–30923DM.**

United States Bankruptcy Court, N.D. California.

May 14, 2004.

Adam M. Cole, Heller, Ehrman, White and McAuliffe, Gary M. Kaplan, James L. Lopes, Janet A. Nexon, Jeffrey L. Schaffer, Kimberly A. Bliss, William J. Lafferty, Howard, Rice, Nemerovski, Canady et al, J. Michael Kelly, Martin S. Schenker, Law Offices of Cooley Godward, Jon B. Streeter, Robert A. Van Nest, Law Offices of Keker and Van Nest, San Francisco, CA, Benjamin Hoch, Dianne Coffino, Marc Hirschfield, Michael C. Hefter, Robert C. Myers, Law Offices of Dewey Ballantine, New York, NY, David Agay, Stacy D. Justic, Law Offices of Winston and Strawn, Chicago, IL, Jamie L. Edmonson, Richard Levin, Skadden, Arps, Slate, Meagher and Flom, Los Angeles, CA, John S. Moot, Skadden, Arps, Slate, Meagher and Flom, Washington, DC, for Debtor.

Patricia A. Cutler, Office of the U.S. Trustee, San Francisco, CA, for trustee.

Stephen L. Johnson, Office of United States Trustee, San Francisco, CA, for U.S. Trustee.

Lorie A. Ball, Michael I. Sorochinsky, Paul S. Aronzon, Robert J. Moore, Milbank, Tweed, Hadley and McCloy, Los Angeles, CA, for Creditor Committee.

## MEMORANDUM DECISION REGARDING OBJECTION TO LATE FILED CLAIMS

DENNIS MONTALI, Bankruptcy Judge.

### I. *Introduction*

Enron Energy Marketing Corp. ("EEM") and Enron Energy Services, Inc. ("EES," and with EEM, "Enron") timely filed two proofs of claim (the "Original Claims") on September 5, 2001, the claims bar date. Enron later filed two amended proofs of claim (the "Amended Claims") on February 17, 2003. Pacific Gas and Electric Company ("Debtor") objected to the allowance of the Amended Claims because they were filed out of time.[1]

The matter came before the court on April 23, 2004, with the appearances of counsel noted in the record.

For the reasons summarized below, the court sustains Debtor's objections and disallows the Amended Claims as untimely.

### II. *Facts* [2]

The facts are not in dispute and will only be summarized here.

The Original Claims are based upon Debtor's

"... non-payment of significant cumulative unpaid credit balances that were accrued and owing prior to April 6, 2001, the date [Debtor] filed its bankruptcy case ...."

(Riders to Original Claims, p. 1.)

The riders to the Original Claims summarize the "Direct Access" program and the rights, duties and obligations of the parties under Energy Service Provider (ESP) Service Agreements ("ESP Agreements") executed by Debtor and both EES and EEM. As described in the riders, beginning in mid–2000, Debtor owed Enron substantial amounts as a result of the "PX Credit," which Enron estimated as of the date of Debtor's Chapter 11 filing to be in excess of $400 million.

The credits are based on Debtor's obligation to pay Enron for electricity it did not have to provide to Enron's Direct Access customers. The higher the price of electricity Debtor did not have to produce or purchase, the more it was obligated to pay Enron.

At oral argument counsel for Enron suggested that the credits were based on Debtor's tariffs, while counsel for Debtor quoted the riders and insisted that Enron's alleged right of recovery "...arise[s] under the Energy Services Provider Agreement[s] (sic) ...." The precise origin of the right to recover the credits is not material to whether the Amended Claims should be allowed as timely.

While each of the Original Claims reserved to Enron the right to amend them "to describe the claim, including without limitation, the amount thereof or the theory of recovery ...." (Riders to Original Claims, p. 2), there was no reference to any facts pertaining to the California Public Utilities Commission's ("CPUC") Direct Access Cost Responsibility Surcharge

---

1. Debtor has reserved its substantive objections to the Amended Claims in the event they are deemed to be timely. Disputes regarding the Original Claims have been settled.

2. The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr.P. 7052(a).

("DA CRS") described below. There was also no notice to Debtor that the Original Claims might later include a demand for reimbursement based upon Enron's customers' DA CRS liability. Indeed, such liability was not reasonably foreseeable, either in fact, or from the face of the Original Claims.

Nor were there any allegations that prior to Debtor's bankruptcy Enron had switched its Direct Access customers to Debtor's "bundled" service and thus those customers might assert claims against Enron.

On March 9, 2001, the Regents of the University of California and the Board of Trustees of the California State University (the "DA plaintiffs") sued EES in the United States District Court for the Northern District of California for a preliminary injunction, specific performance, breach of contract, and other relief. (*The Regents of the University of California, et al. v. Enron Energy Services, Inc.* (U.S.D.C. No. C–01–1006)). The essential factual allegations of that lawsuit were that EES terminated the DA plaintiffs' Direct Access service and required them to obtain electric service from Debtor under Debtor's bundled service arrangement. The DA plaintiffs principally sought a return to Direct Access service.[3] That litigation was settled approximately three months after it was filed, with the DA plaintiffs reserving any claim they may have then had or in the future might have against EES for losses or assessments incurred as a result of their being returned to bundled service, and which damages would be based upon energy purchased by the California Department of Water Resources ("CDWR") between February and June, 2001, a critical component of CPUC's assessment of the DA CRS.

Beginning in January, 2002, the CPUC commenced proceedings to deal with various Direct Access issues. After several months of administrative proceedings, the CPUC issued a decision on November 7, 2002 (D.02–11–022) which imposed the DA CRS on various parties that had received bundled service during certain periods of early 2001. By that same time, some of Enron's former customers had filed claims (the "Surcharges Claims") in Enron's Chapter 11 case[4] seeking reimbursement DA CRS obligations for which they ultimately may be found liable as a result of their return to bundled service.

Enron filed the Amended Claims which are in the nature of indemnity claims against Debtor to the extent Enron may be liable to its own former customers who have asserted the Surcharges Claims based upon their liability for the DA CRS. While Enron disputes liability to its former customers and continues to contest the Surcharges Claims vigorously, it contends that Debtor is liable to it for any of its liability on the Surcharges Claims as additional damages resulting from Debtor's failure to pay the unpaid credit balances reflected in the Original Claims. The total of the Amended Claims based upon Enron's own potential exposure on the Surcharges Claims was originally estimated to be at least $510 million.[5]

3. While the parties have not provided the court with any evidence that the DA plaintiffs sued EEM, there is no contention that Enron (as defined herein) was unaware of the litigation.

4. Enron and other affiliates filed Chapter 11 cases in the Southern District of New York on December 2, 2001.

5. As a result of the settlement among Debtor and Enron and other of its affiliates which has been approved by this court and by the Enron Chapter 11 court, the potential liability of Debtor to Enron based upon the Amended Claims is capped at $30 million.

III. *Discussion*

■ Enron contends that under Fed. R. Bankr.P. 7015, which incorporates F.R.C.P. 15(c) and which in turn may be made applicable to claims objections as contested matters by Fed. R. Bankr.P. 9014(c), the Amended Claims relate back to the Original Claims, and thus may be deemed timely. Debtor does not contest the availability of F.R.C.P. 15(c) but simply contends that there is no relation back here.

In the alternative, Enron contends that because the Surcharges Claims were not foreseeable until well after the claims bar date, the Amended Claims may be allowed as late filed claims under the doctrine of "excusable neglect" as articulated by the United States Supreme Court in *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) and the many cases that have followed that decision.

A. *The Amended Claims Do Not Relate Back To The Original Claims.*

The Original Claims are essentially breach of contract claims based upon Debtor's undisputed failure to pay cumulative unpaid credit balances owed to Enron. If those claims are based on tariffs and CPUC decisions, rather than the terms of the ESP Agreements, the essence is the same, namely, non-payment of money due. The operative facts supporting either theory are not contested: Debtor owed the credits; Debtor did not pay the credits; Enron filed the Original Claims based upon nonpayment of the credits.

The theory underlying the Amended Claims is much more complex, and involves a sequence of subsequent events, no facts of which have been pleaded in the Original Claims: Enron's switching of its customers from Direct Access service to bundled service in early 2001; whether such switching was necessary; the subsequent commencement of administrative proceedings by the CPUC in early 2002; the imposition of the DA CRS obligations by the CPUC late in 2002; the assertion of the Surcharges Claims by Direct Access customers against Enron beginning in the Fall of 2002; finally, Enron's claims for reimbursement against Debtor in the Amended Claims in February, 2003.

■ The parties rely on the same cases to reach opposite results. For example, *Martell v. Trilogy Ltd.*, 872 F.2d 322, 324–25 (9th Cir.1989) stands for the proposition that the first sentence of F.R.C.P. 15(c) controls the relation back of an amendment seeking to state a new claim against an original defendant. A new claim must be based upon a common core of operative facts. It is the operative facts that control the question of relation back, not the theory of liability applied to those facts. *Santana v. Holiday Inns, Inc.*, 686 F.2d 736, 739 (9th Cir.1982) ("Once the defendant is in court on a claim arising out of a particular transaction or set of facts, he is not prejudiced if another claim, arising out of the same facts, is added.") Stated otherwise, the court is to determine whether the amendment is transactionally related to the original pleading. Similarly, *Percy v. San Francisco General Hospital*, 841 F.2d 975, 978 (9th Cir.1988), directs the court to compare the original complaint (Original Claims here) with the amended complaint (Amended Claims here) to decide whether the claim to be added will likely be proved by the same kind of evidence offered in support of the original pleading. And in *Dominguez v. Miller (In re Dominguez)*, 51 F.3d 1502, 1510 (9th Cir.1995), the court makes reference to the "same kind of evidence" as necessary to relate back the later claim to the earlier one. Under these well-settled principles there must be facts alleged in the Original Claims that

would reasonably alert Debtor to the possibility of assertion of new theories based upon those facts to support the Amended Claims, whether or not those facts or events were foreseeable. There were none.

The court agrees with Debtor that a substantial quantum of additional proof is necessary. The court disagrees with Enron, which contends that the termination of customers from Direct Access service to bundled service was part of its obligation to mitigate its damages. The fallacy with this argument is that Debtor's nonpayment of the credits has little to do with what ultimately caused the CPUC to direct that the Direct Access customers pay the DA CRS as a share of the increased energy costs occasioned by the energy crisis and the subsequent purchase of electricity by the CDRW. In other words, even if Debtor had never defaulted on the Direct Access credit obligations to Enron, it may well have followed that Direct Access customers would have been switched back to bundled service and the CPUC may well have reached the same conclusion regarding the imposition of the DA CRS on former Direct Access customers. Enron begs the question by arguing that the Amended Claims merely seek to recover additional damages *resulting* from Debtor's breach of its obligation to pay the credits. To show that those additional damages *result* from Debtor's breach requires different evidence. That evidence will not be found within the core of operative facts supporting the Original Claims.

In summary the court concludes that the Amended Claims do not sufficiently relate to the Original Claims for purposes of F.R.C.P. 15(c).

### B. *The Amended Claims May Not Be Treated As Timely Under The Excusable Neglect Theory.*[6]

As well known to the parties, and as has been raised in numerous objections to late filed claims in this Chapter 11 case, the *Pioneer* decision directs the court to consider excusable neglect after consideration of various factors, including the reason for the delay; the danger of prejudice to the debtor; the length of delay and its impact on judicial proceedings; and whether the claimant acted in good faith. *Pioneer*, 507 U.S. at 395, 113 S.Ct. 1489. Enron bears the burden of presenting facts demonstrating excusable neglect. *Key Bar Invs., Inc. v. Cahn (In re Cahn)*, 188 B.R. 627 (9th Cir. BAP 1995).

The reason for the delay in filing the Amended Claims goes directly to the heart of the nature of those claims themselves[7], namely the post-bar date developments at the CPUC and its subsequent imposition of the DA CRS on various Direct Access customers. Yet when EES was sued in

---

**6.** Apart from its excusable neglect theory, Enron also argues that somehow the Amended Claims should be allowed as timely under the long-standing liberal Ninth Circuit policy of allowing amendments of timely informal proofs of claim. See *County of Napa v. Franciscan Vineyards, Inc. (In re Franciscan Vineyards)*, 597 F.2d 181 (9th Cir.1979) and other cases following *Franciscan Vineyards*. Since there is no evidence of any informal proof of claim to amend to add the Amended Claims, this argument is unavailing. If Enron is arguing that the Original Claims are informal proofs of claim that are capable of out-of-time amendment, then its whole argument under F.R.C.P. 15(c) would be unnecessary. See also *Hi–Tech Communications Corp. v. Poughkeepsie Business Park, LLC (In re Wheatfield Business Park, LLC)*, 308 B.R. 463 (9th Cir. BAP 2004) (misdirected formal proof of claim treated as informal proof of claim for purposes of liberal rule of amendment).

**7.** Enron's claims in the Amended Claims arose pre-petition *In re Jensen*, 995 F.2d 925 (9th Cir.1993); *Hassanally v. Republic Bank*, 208 B.R. 46 (9th Cir. BAP 1997).

March, 2001, Enron was put on notice that the DA plaintiffs wished to return to Direct Access service and that it was being accused of transferring the DA plaintiffs' accounts from Direct Access to the bundled service, in apparent violation of their rights under their agreements with EES. In addition to seeking injunctive relief, the DA plaintiffs charged EES with breach of contract and breach of the implied covenant of good faith and fair dealing, and prayed for actual damages "as a result of [EES'] breach to perform [sic] its duties and provide Direct Access services ... not for less than $75,000." The DA plaintiffs also sought attorneys' fees, costs and litigation expenses.[8] That litigation was settled in mid–2001 (before the claims bar date in Debtor's Chapter 11 case) and the DA plaintiffs reserved their right to seek damages against EES for any losses or assessments that might follow. While the CPUC proceedings had not formally begun by then, this was Enron's first warning of a potential liability based on the events of early 2001 and arising out of Debtor's nonpayment of the credits and Enron's transfer of its customers to bundled service.

Then, in January, 2002, the CPUC began proceedings that eventually resulted in the imposition of the DA CRS later the same year. That was another clear early warning to Enron that it may have claims over against Debtor based on what might unfold at the CPUC. Finally, by October, 2002, when former customers of Enron began filing their Surcharges Claims, there could be no doubt about Enron's potential liability and the possibility of seeking indemnity from Debtor.[9]

The only somewhat persuasive reasons Enron puts forth to justify the delay in asserting the Amended Claims is the sheer size of the Chapter 11 cases of Enron and its affiliates, the vast number of claims filed in those cases and the limited resources available to them. While those contentions are not supported by competent evidence, they have not been challenged by Debtor and are accepted as true. But Debtor counters that the Surcharge Claims represented a huge portion of at least EES's total liability, and notes that Enron and its affiliates did file numerous timely claims in this case. It also contends that other energy service providers timely filed claims based on theories similar to those of the Amended Claims, illustrating that it was not unreasonable for such claims to have been anticipated in a timely manner.

On balance, Enron has not justified the delay from mid–2001 at the earliest, or even from early 2002, until February, 2003, when it filed the Amended Claims. The court weighs these two interrelated *Pioneer* factors (reasons for and length of delay) in Debtor's favor.

As to prejudice to the Debtor, Enron argues that Debtor has settled its differences with the CPUC and obtained confirmation of its Plan of Reorganization. It then stresses that creditors will not be

---

8. Counsel for Enron has argued that the primary purpose of the litigation was injunctive relief and the restoration of Direct Access service. He also contends that the ultimate settlement of that litigation was designed to insure that the DA plaintiffs would have Direct Access service and that Enron would be able to continue to provide it. That may be so, but there plainly was an allegation of money damages occasioned by the alleged breach of contract by EES.

9. The court rejects Debtor's theory that such claims were asserted as early as July, 2002, since the evidence supporting that contention is a proof of claim filed by The Lurie Company based upon rejection of retail energy/sales contracts, and not based upon Surcharges Claims.

affected since Debtor intends to pay them in full plus interest. Debtor concedes that even if it is obligated to pay up to $30 million on the Amended Claims, the success of its reorganization will not be threatened. It argues without substantiation that significant costs will be incurred by the estate if numerous party claimants are allowed to assert late claims of the type asserted by Enron. Nevertheless Debtor offers no evidence of any similar claims and in fact cites only to pending objections on the merits (rather than on timeliness) of a claim filed by Boston Properties Limited Partnership, a former Direct Access customer of Debtor. The court weighs this *Pioneer* factor narrowly in favor of Enron.

On the *Pioneer* factor of good faith, Debtor contends that Enron has failed to demonstrate good faith and thus has not carried its burden. The court will not weigh this factor against Enron absence evidence to the contrary. It is inconceivable that a Chapter 11 debtor in possession would knowingly or intentionally ignore the opportunity to assert a multi-million dollar claim in a solvent Chapter 11 case such as Debtor's.

On balance, while the last two factors tip slightly in Enron's favor, the authorities construing *Pioneer* weigh the reasons for the delay factor most heavily. See *Graphic Communications Int'l Union, Local 12–N v. Quebecor Printing Providence, Inc.,* 270 F.3d 1 (1st Cir.2001), and cases cited therein. Given that Enron had early warning about the potential for liability on its Surcharges Claims, and thus the basis on which to assert indemnity claims against Debtor, and rather weak justification for waiting until February, 2003, the court balances the totality of the *Pioneer* factors in favor of Debtor and determines that the doctrine of excusable neglect will not save Enron and justify allowance of the Amended Claims.

IV. *Conclusion*

For the reasons stated above, Enron's Amended Claims must be excluded from participation in this Chapter 11 case because they neither relate back to the timely filed Original Claims nor is the late filing of the Amended Claims excusable. The court is concurrently issuing an order disallowing the Amended Claims consistent with this memorandum.